UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                                       :

In re ex parte Petition of Shagang Shipping     :
Co., Ltd..                                        :      Case No. 14-misc-00053
                                         :

--------------------------------------------------------------X

### SUPPLEMENTAL DECLARATION OF JULIAN ANDRE DAVIES IN OPPOSITION TO MOTION TO VACATE THE DISCOVERY ORDER AND TO QUASH THE SUBPOENA

I, JULIAN ANDRE DAVIES, pursuant to Section 1746 of Title 28 United States

Code, hereby declare and say the following under the penalty of perjury:

1.     I am an individual of sound mind and body, and have never been convicted of a crime of moral turpitude.

2.     I am a qualified English Solicitor and am a partner of Holman Fenwick Willan LLP, which has a principal place of business at: Friary Court, 65 Crutched Friars, London EC3N 2AE, United Kingdom.  I submit this Supplemental Declaration in Opposition to HNA Group Co. Ltd's ("**HNA**") Motion to Vacate the Discovery Order, Quash Ex Parte Subpoenas, or alternatively, for a Protective Order limiting Scope of Subpoenas ("**motion to vacate**").

3.     The information contained in this Supplemental Declaration is true and accurate to the best of my knowledge and belief.

4.     The discovery sought by Shagang Shipping Co., Ltd. ("**Shagang**") is necessary and critical in determining HNA's creditworthiness, and in turn, the appropriate damage calculation in proceedings pending before the High Court of Justice, Queen's Bench Division, Commercial Court, in England ("**English proceeding**").

**Basis for Discovery Sought by Shagang:**

5.     In the English proceeding, Shagang has claimed damages of USD 66,356,281 plus interest and costs from HNA, arising from HNA's breach of its obligations under a Performance Guarantee related to the August 6, 2008 time charter of the M/V DONG-A ASTREA.  The term of the time charter with Grand China Shipping Co., Ltd. ("**GCS**") was for a minimum of eighty two (82) months and maximum of eighty six (86) months.

6.     With respect to the quantum of damages, HNA has argued that, since the charter party would have run until February 2017, Shagang is required to give HNA credit for the accelerated receipt of damages.

7.     Specifically, in HNA's Defence and Counterclaim, appended as Exhibit 5 to the Grieveson declaration (Docket #9-5), HNA stated as follows with respect to the appropriate calculation of damages:

*15(b) The Claimant [Shagang] is however required to give credit for accelerated receipt in circumstance where the Charterparty would have run to February 2017. The Defendant [HNA] will say that the discount rate for accelerated receipt should be assessed by reference to the Claimant's Weighted Average Cost of Capital ("WACC"). Pending disclosure, the best particulars that the Defendant can give of the WACC is 13.62% - 22.64% per annum.*

*(c) Further, the Claimant is required to give credit for the possibility of catastrophic contingencies, such as total loss, **insolvency**, etc.* (emphasis added).

8.  In the English High Court proceedings, each party has appointed an expert forensic accountant to address this issue of the discount for accelerated receipt.

9.  I attach as **Exhibit A** hereto, a declaration from a leading expert forensic account in the shipping industry, Mr. David Chopping, a Partner at Moore Stephens LLP, in which he explains in detail how HNA's creditworthiness is directly relevant to the calculation of accelerated receipt.

10. As explained by Mr. Chopping, in order to provide credit for accelerated receipt of a payment otherwise payable in the future, a discount factor must be applied to the future receipt. This discount factor is derived from the discount rate, which in turn comprised of two (2) components: (i) the risk free rate, which reflects the interest element of accelerated receipt and is established by referring to yields prevailing on U.S. Treasury Bonds; and (ii) ***the risk premium***, which addresses the issues other than interest which need to be taken into account. In particular, unlike the U.S. Treasury Bond, the possibility that the future sums or estimated cash flows from the future receipt of net hire will not arise as expected because, for example, the debtor is unable to pay. Id.

11. As such, it is clear that HNA's creditworthiness is a risk factor which must be considered in determining the discount rate used to give credit for the accelerated receipt of the future income. (see Exibit A)

12. Mr Grieveson states at paragraph 14 that the creditworthiness of HNA is 'irrelevant' to the calculation for the discount of accelerated receipt. At paragraph 16 he further says HNA says their creditworthiness is 'irrelevant'. Finally, at paragraph 17 Mr Greiveson contends that Shagang's pleaded case is that HNA's creditworthiness is 'irrelevant'.

13. Either Mr. Grieveson is putting up straw men for the sake of knocking them down, or Mr. Greiveson fails to understand his client's own pleaded case. It is HNA's pleaded case that there should be a risk premium (see Docket # 9-5, paragraph 15(c) of HNA's Defence and Counterclaim) added to the discount for accelerated receipt. Mr Chopping, in his declaration (see Exhibit A), contends that as a matter of accountancy, an assessment of the possibility that the creditor (here HNA) will not be able to meet net hire instalments should be carried out.

14. Shagang's pleaded case in the English proceeding is that, as a matter of law, there is no binding precedent that this risk should be assessed and damages awarded to the non-breaching party discounted accordingly. This does not, however, preclude Shagang's forensic expert from answering HNA's pleaded case and HNA's expert evidence. Shagang's forensic expert is tasked with assessing what the risk premium should be if the English High Court finds a risk premium should be applied, and in the appended declaration, Mr Chopping has provided very clear reasoning as to why HNA's creditworthiness is relevant.

15.   The discovery sought is intended to provide a well rounded and complete picture of HNA's creditworthiness. The information should include the number of loan facilities and bank accounts the company has open, the applicable interest rates, its corporate bonds and debentures and applicable interest rates, its contractual payment obligations, its average cash balances in HNA's various bank accounts, and its financial arrangements with subsidiary and affiliate companies.

16.   Mr. Grieveson boldly asserts that HNA's creditworthiness is irrelevant and that he believes Shagang's application is an inappropriate device to obtain asset discovery prior to judgment. However, as explained above HNA's creditworthiness is very relevant. It is HNA's own pleaded case in the English High Court proceedings, and therefore a live issue, that a discount of 1.5% (or about USD995,344) turns on this issue. Accordingly, this application is not merely a fishing exercise as Mr Greiveson implies but, on the contrary, a real and genuine issue in the English proceedings on which significant sums turn and the assessment of HNA's creditworthiness is very relevant.

17.   The issue of HNA's creditworthiness is clearly relevant to the merits of the pending claim before the English High Court, and/or is relevant as a response to HNA's defence on the issue of quantum. Further, Mr. Grieveson cannot support his contention (at paragraph 2) that Shagang's application is an inappropriate device to obtain asset discovery prior to judgment.

**Other Points Raised in Grieveson Declaration:**

18.   As a preliminary point, I would convey my regret that Mr Grieveson feels compelled to repeatedly imply I have intentionally misled this Honourable Court (see his paragraphs 8, 9 and 10). Further, it is disappointing that Mr. Grieveson would use this venue to make unsubstantiated, and very serious, allegations of bribery (see his paragraph 11) against my client. To answer such mud-slinging, I unfortunately will need to provide a fuller picture of the background.

19.   Mr Grieveson repeatedly says all outstanding hire has been paid (see paragraphs 5(1), 7 and 10). Mr Grieveson also says my reference to the six (6) arbitral awards against GCS are legally irrelevant to HNA, and that I give the wrong impression about the relevance of the Sixth Arbitration Award where the Tribunal found that GCS was in repudiatory breach of the charter party. Finally, at paragraph 6, Mr. Grieveson claims I wrongly conflate GCS and HNA.

20.   I do not see how these points could possibly be relevant to the discovery order at dispute. They are bad points, based on semantics, or worse: implied adverse inferences against my client.

21.   At no point between October 2010 and January 2012, when Shagang terminated the charter party, did GCS pay hire on time in accordance with the terms of the charter party. Throughout this period GCS traded the vessel for their own account, without paying daily hire of USD52,500 due to our clients, which had a significant impact on their cash flow. Shagang made repeated demands on GCS and HNA, all of which were ignored.

22.   Neither GCS nor HNA honored the five (5) arbitral awards Shagang obtained against GCS. Instead, Shagang was forced to engage legal counsel in India, South

Africa, Hong Kong, England and China to enforce the arbitral award in its favor, and only after successful vessel arrests and the issuance of garnishment Orders over GCS's bank accounts, did they finally pay the outstanding hire. This entailed Shagang incurring huge legal costs in order to chase GCS all over the World, and force them to honor the awards and/or pay outstanding hire.

23.     Meanwhile, Shagang repeatedly demanded that HNA honor its unambiguous, express undertakings in the performance guarantee, which stated:

> "In the event that the Charterer fails to perform their obligations under the CP, against your written notice (the "Notice"), _we shall take over the position of the Charterer under the CP, and perform the CP as Charter_" (my emphasis).

24.     In a demand letter dated 16 December 2010, Shagang served written notice on HNA pursuant to the undertaking in the guarantee to perform as charterers (**Exhibit B**).

25.     At paragraph 5(2), Mr Grieveson refers to an Award on Jurisdiction. The background is that HNA declined to authorize its solicitors to accept Shagang's English High Court Claim Form (**Exhibit C**), despite our requests, which meant Shagang would have to serve out of jurisdiction in China through diplomatic channels. This often takes up to a year. Shagang therefore commenced arbitration under the arbitration clause in the charter party on the basis that HNA were now performing the charter party, following receipt of the written notification dated 16 December 2010, and therefore bound by the arbitration clause.

26.     In the event, the Tribunal determined that it did not have jurisdiction to determine the matter, on the basis that the Guarantee itself provided for the jurisdiction of the English High Court. In making its Award, the Tribunal also gave _obiter dicta_ commentary as to the construction of the wording in the guarantee, which is not binding on the parties.

27.     Any contention by Mr. Grieveson (as in paragraph 6) that Shagang has "wrongly conflate[d]" GCS and HNA is rejected. GCS were obliged under the terms of the charter party, to pay hire and perform the charter party. Once GCS defaulted, HNA were following notification, also obliged to pay hire and perform the charter party. They were both repeatedly called on to perform, and Shagang repeatedly served demand letters on both entities, which were ignored until such time as enforcement efforts forced payment. GCS has been found liable for repudiatory breach of the charter party and Shagang Shipping were awarded USD58,275,709.52 in damages by the London Tribunal. GCS' application to appeal to the High Court was dismissed. It follows that Shagang's case against HNA has a real prospect of success and has good claims against HNA under the performance guarantee.

28.     I do not accept Mr. Grieveson's assertions in paragraph 8 of his declaration, that the reference in paragraph 11 of my first declaration as to the Fifth Arbitral Award was misleading. In applying for the Fifth Arbitral Award, Shagang deliberately sought a declaration that Charterers were in continuing repudiation of the charter party. This was to put GCS, and HNA, on notice that if one of them did not step in and pay hire, Shagang intended to terminate the charter party and claim in damages for the balance of the charter party. These claims would be against GCS and HNA, under the charter party and guarantee respectively.

29.    At the time Shagang terminated the charter party over USD 15 million in hire was unpaid. Charterers had not paid hire of USD52,500 per day in accordance with terms of the charter for 15 months. Whilst Mr Grieveson states that hire was eventually paid, he completely ignores the fact that GCS was trading the ship at Shagang's expense for well over a year. Meanwhile, HNA were also refusing to honor their obligations under the guarantee to perform the charter.

30.    Mr Grieveson, at his paragraph 12, seems to say that there is new law from the English Court of Appeal that will allow HNA to prove that GCS was not in repudiatory breach. For the record, I strongly disagree with this proposition, and am supported by our client's Queens Counsel in London, that HNA's case on liability is hopeless.

31.    Mr. Grieveson's argument that the previous five (5) awards against GCS, and in particular that the Sixth Award where GCS was held in repudiatory breach, are not legally relevant to the claim against HNA is just plain wrong. Whilst not binding on HNA, the arbitral awards are an integral part of the factual background of the matter, during which Shagang gave GCS and HNA every possible opportunity to rectify their breaches and perform the respective contracts. In the event, they refused to perform.

32.    At the time of Shagang's termination of the charter party with GCS, GCS/HNA (I refer to HNA because 'they' had been called on to perform the charter party pursuant to the guarantee) owed Shagang in excess of USD15 million in outstanding hire, in addition to Shagang's claim in damages for the remaining duration of the charter party. Accordingly, Shagang filed a winding up petition against GCS in Hong Kong. On the eve of a hearing, HNA's wholly owned subsidiary, HNA Group International Company Limited, paid the sum of USD14,112,391.94 to Shagang in March 2012 (**Exhibit D**).

33.    Since Shagang terminated the charter party protracted litigation has ensued, and HNA have done everything in their power to delay matters.

34.    After HNA strategically refused to agree to service of Shagang's Claim Form by way of service on their English solicitors, Wikborg Rein, Shagang was obliged to apply to the Court in England for leave to serve out of jurisdiction. On 11 September 2012 (**Exhibit E**), Shagang obtained permission to serve proceedings on HNA out of the jurisdiction in the People's Republic Of China. This took over 10 months as the Claim Form, together with the Particulars of Claim that included hundreds of pages of documents such as demand letters translated from English into Mandarin, was not served through diplomatic channels until late July 2013

35.    In the meantime on 14 May 2013, Shagang served a statutory demand in the sum of USD58,375,709.52 on HNA (**Exhibit F**).

36.    On 5 June 2013, HNA replied in the Hong Kong proceedings indicating that the question of liability was to be determined by the court (presumably this is the English High Court).

37.    On 19 July 2013, Shagang sent a letter to HNA warning that it intended to file a winding up petition against HNA in Hong Kong as its statutory demand dated 14 May 2013, had not been paid within the 42-day period allotted to foreign Companies established outside Hong Kong but with assets in the jurisdiction (**Exhibit G**).

38.     On 26 July 2013, HNA responded with a fax, in which it alleged that HNA had substantive defences to the claim for payment under the Guarantee which it would put forward in the English High Court in due course (**Exhibit H**).

39.     It was only after this, and after the winding-up petition in Hong Kong was issued and sent to HNA by facsimile on 1 August 2013, that, on 15 August 2013, HNA acknowledged service of the Claim Form in the English Action. In other words, HNA elected to voluntarily accept service, again strategically, so that they could argue in the Hong Kong Courts that they had defences which were subject to the jurisdiction of the English High Court.

40.     It is only after the sequence of events as set out above that the vague allegations of bribery as purportedly set out in Mr Grieveson's statement have emerged. In particular, it is to be noted that no such allegations have ever previously been raised either by GCS or HNA in either: (i) the arbitration proceedings leading to the Award; or (ii) the application for permission to appeal the Award; or (iii) the winding-up proceedings in Hong Kong. Needless to say no such allegations were raised since the commencement of the charter party in 2008. This allegation only came to light when HNA had to serve their defence in the current English proceedings.

41.     Attached as **Exhibit I** hereto are two (2) witness statements made by Mr. Grieveson in September and October 2013, in the English proceeding, requesting an extension of time so that further investigations could be carried out regarding HNA's unsubstantiated allegation of bribery.

42.     It is neither necessary nor appropriate for Shagang to respond in detail to the allegations in Mr. Grieveson's witness statements in support of an application to the English High Court for an extension of time to enter a Defence. A cursory review of Mr Grieveson's previous statements demonstrates that HNA's bribery allegations are wholly unsubstantiated hearsay. The allegation is offensive, and our clients will insist on an individual Partner at Wikborg Rein, or HNA's Queens Counsel, signing their name to such an allegation.

43.     In the event, on 4 November 2013, HNA served its Defence and Counterclaim which (unsurprisingly) makes no reference whatsoever to bribery allegations. HNA did not plead a defence based on bribery, and to date, has not amended its pleadings.

44.     Now, over six (6) months later, HNA has still not pled bribery in the English proceeding, or to present even a shred of evidence to support this allegation. The reason for this is simple – HNA's allegations remain unsubstantiated and are nothing more than a misguided and inappropriate attempt to disparage Shagang.

45.     Accordingly, I am surprised and disappointed that these allegations are now being raised before this Honourable Court in the Southern District of New York. The allegation adds nothing in answer to the pertinent question as to whether the discovery order is appropriate, and therefore must be designed purely to taint Shagang with illegality, which is entirely inappropriate.

46.   In respect of paragraph 18, and Mr Grieveson's contention that the purpose of Shagang seeking discovery, I would reiterate the creditworthiness of HNA is a live issue in the English High Court proceedings.

Pursuant to Section 1746 of Title 28 United States Code, I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated:   Shanghai, P.R. China
        April 7, 2014

Respectfully submitted,

By:   _____
      **JULIAN ANDRE DAVIES**

**Exhibit A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                    :
In re ex parte Petition of Shagang Shipping         :
Co., Ltd..                                           :   Case No. 14-misc-00053
                                                    :
------------------------------------------------------------X

<u>DECLARATION OF DAVID MICHAEL CHOPPING IN
OPPOSITION TO MOTION TO VACATE THE DISCOVERY
ORDER AND TO QUASH THE SUBPOENA</u>

I, David Michael Chopping, pursuant to Section 1746 of Title 28 United States Code, hereby declare and say the following under the penalty of perjury:

## 1.    INTRODUCTION

1.1.    I am an individual of sound mind and body, and have never been convicted of a crime of moral turpitude.

1.2.    I submit this Declaration in Opposition to HNA Group Co. Ltd's ("HNA") Motion to Vacate the Discovery Order, Quash *Ex Parte* Subpoenas, or alternatively, for a Protective Order limiting Scope of Subpoenas (hereinafter "motion to vacate").

1.3.    The information contained in this Declaration is true and accurate to the best of my knowledge and belief.

1.4.    I am a chartered accountant and a partner in Moore Stephens LLP the world's leading financial advisor to the shipping industry, which has a principal place of business in England at 150 Aldersgate Street, London EC1A 4AB. I have acted as an expert accountancy witness in several cases. I am the author of an annual guide to UK accounting practice and have acted as the editor of UK accounting standards. I am the chairman of the Technical and Practical Audit Committee of the Institute of Chartered Accountants in England and Wales. I have had many articles on financial reporting matters published in the shipping and financial press. My opinions set out below are endorsed by the Moore Stephens Head of Shipping and  the Head of Corporate Finance. I have been involved in the consideration of damages in a number of time charter cases.

1.5.     I have been asked to consider Mr Christopher James Grieveson's declaration in opposition to motion under 28 USC 1782 dated March 21 2014 and in particular his comments at paragraphs 13 and 14.

1.6.    In paragraph 13 Mr Grieveson quotes Mr Davies's assertion that discovery is relevant to *"assist in establishing the credit worthiness of HNA in order to determine the appropriate risk premium to incorporate into the discount rate, used in calculating the accelerated receipt of damages…"*. I entirely agree with this statement.

1.7.     Mr Grieveson goes on to state in paragraph 14 that the quotation in paragraph 13 (and in my previous paragraph) is not correct. Mr Grieveson then states *"A deduction from the principal claim on the grounds of accelerated receipt of damages is designed to account for the fact that money paid into the hands of the plaintiff now is more valuable than money that would otherwise have been paid in the future."* I broadly agree with this statement but consider that it would have been clearer if Mr Grieveson had inserted the words "a sum of" before the first occurrence of the word money and the words "the same sum of" money on the second occurrence. A better definition being therefore:   *"A deduction from the principal claim on the grounds of accelerated receipt of damages is designed to account for the fact that a sum of money paid into the hands of the plaintiff now is more valuable than the same sum of  money that would otherwise have been paid in the future.".* The reason why the sum of money actually received today is worth more than the same sum of money receivable in the future is because of interest during the period between now and the future receipt (referred to as the Time Value of Money) and, crucially, the Risk that the future receipt will not arise as expected. To use the old English expression "A bird in the hand is worth two in the bush". Accordingly, if HNA are called upon to pay these damages, then their credit worthiness is relevant to the calculation of damages. Therefore, I disagree with Mr Grieveson's assertion that it is irrelevant.

1.8.     Indeed, together with the appropriate risk free rate of interest which needs to be taken into account, determining the additional appropriate risk premium to cover the possibility of non payment by the charterer (or their guarantor) lies at the very heart of the damages calculation.

1.9.     Mr Grieveson goes on to say in paragraph 14 that lack of credit worthiness could be used by a defaulting party to reduce the amount of damages payable. I do not doubt that those liable to pay damages might try to put forward such a defence, but the actual credit worthiness is a matter of fact for the court to determine from independent evidence, such as the documentation currently sought from HNA.

1.10.    In paragraphs 15, 16 and 17 of his declaration, Mr Grieveson argues that the credit worthiness or counterparty risk of HNA should not be taken into account in determining the discount for accelerated receipt. In fact, a risk premium which takes into account the credit worthiness of the payer of damages of a breached charterparty, must be applied in order to calculate the accelerated receipt of the future net hire or damages, I explain my reasons for this opinion below.

## 2.     THE DISCOUNT RATE

2.1.     It is common ground amongst accountancy experts that, in order to give credit for accelerated receipt of any amount payable in the future, one must apply a discount factor to the future receipt.

2.2.    The discount factor is derived from the discount rate. The discount rate is a combined annual rate made up of two components: (i) the risk free rate; and (ii) the risk premium.

2.3.    The first component, the "risk free rate", is applied to reflect the pure interest element of the accelerated receipt and thus addresses the need to reflect the "time value of money" in the discount rate. The risk free rate is established by reference to the yields prevailing on US government debt (Treasury Bonds) on the valuation date taking into account the unexpired period of the charter concerned. The reason why US Treasury Bond rates are used for the risk free rate is because they are considered to be risk free, as they WILL be paid as and when they fall due.

2.4.    The second component of the discount rate is the additional "premium for risk" which has to be added to the "risk free rate". The risk premium therefore addresses the issues other than interest which need to be taken into account. In particular, unlike the US Treasury Bond, the possibility that the future sums or estimated cash flows from the future receipts of net hire will not arise as expected because – for example, when the debtor is unable to pay.

2.5.    The combined risk free rate and risk premium making up the final discount rate must be tailored to the specific circumstances of the income stream being valued, as is explained below.

## 3.    DISCOUNT RATES - INTERNATIONAL FINANCIAL REPORTING STANDARDS

3.1.    Prescriptive instruction and guidance as to the matters relevant in determining the appropriate discount rate to apply to any future income stream, such as the damages arising on a breached time charter, can be found in International Financial Reporting Standards.

3.2.    International Financial Reporting Standards prescribe in great detail how entities should prepare their annual financial statements and the calculation of the figures they contain. The fundamental purpose of these standards is to ensure that the stakeholders of these entities are able to properly understand the financial statements provided to them and to make comparisons from one entity's financial statements to another. They are international in scope and failure to correctly apply them will, in certain jurisdictions, expose the directors of reporting companies to serious civil and, in extreme circumstances, criminal consequences. Finally, they are subject to review by the International Accounting Standards Board and are amended, from time to time, in the light of experience.

3.3.    The correct approach to determining the discount rate can be found in International Accounting Standard 36, entitled "Impairment of Assets" ("IAS 36"). This standard gives prescriptive instruction on how Discounted Cash Flow principles should be applied and, in particular, it establishes the principles which must be followed in determining the discount rate. This standard is therefore relevant in the present circumstance of valuing the income stream arising from the subject charter, and the discount which should be given for accelerated receipt of the damages.

3.4.   The discount rate to be used under IAS 36 for value in use calculations is (with my emphasis), per paragraph. 55 of that standard:

*"The discount rate (rates) shall be a pre-tax rate (rates) that reflect(s) current market assessments of:*

(a)   *the time value of money; and*

(b)   **the risks specific to the asset** *for which the future cash flow estimates have not been adjusted."*

3.5.   In Appendix A to the standard is additional guidance. Paragraph A19 states (with my emphasis) that:

***"The discount rate is independent of the entity's capital structure and the way the entity financed the purchase of the asset***, *because the future cash flows expected to arise from an asset do not depend on the way in which the entity financed the purchase of the asset."*

3.6.   It therefore follows that under International Accounting Standard 36 the credit worthiness of the payer of the damages (*the risks specific to the asset*) is relevant in determining the discount rate. In contrast, and in the context of the claimant's WACC and its borrowing costs, the standard states that: "*The discount rate is independent of the entity's capital structure and the way the entity financed the purchase of the asset*".

3.7.   Whilst in the present context we are not preparing an entity's financial statements the prescriptive instruction of IAS36 can be taken as best practice in relation to the matters which need to be taken into account in determining the discount rate.

## 4.   THE NEED FOR A RISK PREMIUM – THE KILDARE CASE

4.1.   As stated above, the discount rate comprises the risk free interest rate by reference to US Treasury Bonds and a premium, or further discount, because the future cash flows being valued are not risk free. The issue as to what the risk premium or further discount on top of prevailing interest rates should be was considered in the "Kildare" case (Zodiac Maritime Agencies Limited v. Fortescue Metals Group Limited [Neutral Citation Number: [2010] EWHC 903 (Comm)])

4.2.   In Kildare, the judge arrived at an overall discount for accelerated receipt of income of 3%. This rate comprised 1.5% for 3 year yield in US Treasury bonds (3 years was approximately the remaining period under the Kildare charterparty from the time of the hearing/judgment), plus a further 1.5% (which I have referred to above as the "risk premium") which the judge described as follows:

*"… in my judgment a further discount must be made to reflect what I have earlier categorised as more catastrophic contingencies such as total loss, bankruptcy and so on."* [Paragraph 73]

4.3.   If one accepts the reasonable stance that total loss of the vessel is an extremely unlikely event (for which there is statistical evidence available) then the principal risk which has been specifically identified by the judge is *"bankruptcy"*. In my opinion this must refer to the credit risk that the charterer will not be able to meet the net hire instalments as and when they fall due. If the claimant were bankrupt one would expect the liquidator or receiver to pursue the claim for time charter damages so the credit worthiness of the claimant must be irrelevant.

4.4.   Removing the *"bankruptcy"* credit risk from the issue is illustrative. Imagine a charter on exactly the same terms as in Kildare but in this hypothetical situation, the charterer is the United States Government. In this situation, the net hire due WILL be paid and there is therefore no discount needed for credit risk. Such a debt will have the same risk profile as a Treasury Bond for the same period. Accordingly, in these circumstances, having included a risk free rate for the time value of money into the discount rate there is no need to increase that rate by a further risk premium.

4.5.   In both Kildare and in the present case for Dong-A Astrea the future cash flows due are not payable by the United States Government so a risk premium is necessary. In Kildare, the judge assessed the risk premium at a further 1.5% mindful of the facts of that particular case.

4.6.   I agree with the approach taken by the judge in the Kildare case and that some allowance, in the discount rate, must be given to the possibility of bankruptcy of the charterer, or in this case its guarantor.

**5.     CONCLUSIONS**

5.1.     The prescriptive advice of International Accounting Standard 36 as to the matters relevant to
determining the discount rate; the judge's decision relating to the "further discount" in the
Kildare case, and commercial valuation principles underpinning the need for a risk premium
discussed above, all show that the credit worthiness of HNA is a risk factor which needs to
be taken into account in determining the discount rate which should be used to give credit
for the accelerated receipt of the future income.


Pursuant to Section 1746 of Title 28 United States Code, I declare under penalty of perjury of the laws
of the United States of America that the foregoing is true and correct.


London, England


David Michael Chopping

April 7, 2014

# Exhibit B

英国夏礼文律师事务所 上海代表处　　holman fenwick willan hfw

HNA Group Co Ltd
29, Haixiu Road
Haikou City
Hainan Province
China

Attn: Mr. Chen Feng, President

Holman Fenwick Willan LLP
Room 901, China Insurance Building
166 East Lu Jia Zui Road, Pudong
Shanghai 200120
P. R. China

中国上海
浦东陆家咀东路166号
中国保险大厦9层901室
邮编 200120

T: +86 (0) 21 5888 7711
F: +86 (0) 21 5888 7011

hfw.com

Your Ref:
Our Ref:   59322/3

Email:  Paul.Aston@hfw.com

Date:   16 December 2010

BY FAX (Fax No: 0898 – 6679 8976)

Dear Sir,

DONG-A ASTREA – CP dd 06.08.08

We refer to our letter to you of 9th December to which we have received no reply.  Please find enclosed a letter that we sent to Grand China Shipping (Hong Kong) Co Ltd dated 16 December 2010.  Since then we have now been informed by our clients that the 17th Hire falls due on the 16th December, a copy of which we enclose, and now the amount due has increased to US$3,147,558.92.  Clearly this chronic failure on the part of the Charterer cannot be allowed to continue.

If you wish to prevent disruption to your and Grand China Shipping's business and reputation we suggest that you remedy that failure forthwith by complying with your undertaking in the Performance Guarantee to guarantee performance of the Charter.

For the avoidance of any doubt, please take this as our formal demand on behalf of our clients that you also now comply with the further obligation and undertaking given in the Performance Guarantee which is that HNA Group Co Ltd now take over the Charterparty and perform it for the remainder of the contractual duration.  Please may we have your response to this.  If we do not receive your response by close of business tomorrow, then we shall proceed without any further notice to you.

Yours faithfully,
Holman Fenwick Willan LLP
HFWSH\280073-1

Cc:     Grand China Shipping (Hong Kong) Co Ltd – By email
        Attn: Mr Sun Che

Lawyers for international commerce

London  Paris  Rouen  Brussels  Geneva  Piraeus  Dubai  Hong Kong  Shanghai  Singapore  Melbourne  Sydney

Holman Fenwick Willan LLP is a limited liability partnership registered in England and Wales (with registered number OC317193) and is regulated by the Solicitors Regulation Authority. HFW's registration number is C33377. A list of members' names is open to inspection at the registered office, Friary Court, 65 Crutched Friars, London EC3N 2AE.

77

**Exhibit C**

**Mary Jiang**

| | |
|---|---|
| **From:** | Steffen S. Pedersen [SSP@wr.com.sg] |
| **Sent:** | 16 November 2011 17:01 |
| **To:** | Trevor Fox |
| **Cc:** | Julian Davies; Paul Aston; Russel Low; Chris Grieveson |
| **Subject:** | RE: "DONG-A ASTREA" [IWOV-LEGAL.FID15834] [WRC-SG-LEGAL.FID16884] [HFWSH-HFWSH.FID20858] |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Sirs,

We refer to your below e-mail.

Our clients do not agree to appointing our London office to accept service in respect of your clients claim under the Guarantee presently. It may come as no surprise that our clients do not see it as incumbent on them to short circuit the very clear agreement already encompassed in the Guarantee regarding jurisdiction. Above all, they most certainly do not see it as their duty to assist in bringing this claim more quickly in the High Court in a situation where your clients are persisting in bringing this claim against them in Arbitration and then insisting there is a concurrent right to pursue the same claim in Court. Our client is being pursued for the same amount of money in multiple forums - which must by definition be verging on an abuse of process in one of those forums, and they understandably see no basis to voluntarily accelerate the London Court claim against them at this time.

The Guarantee, which your clients readily negotiated and accepted, does not require our clients to appoint English solicitors to accept service upon request. Accordingly, at the time of contracting your clients were fully aware and unequivocally accepted that they would have to serve out of jurisdiction to bring a claim. It is rather invidious for them now to suggest that our clients are purely seeking to delay matters when all they are doing is sticking to the procedure agreed between the parties. There is no 'excess' delay over and above what could, and should, have been readily appreciated by the Claimants when they accepted the Guarantee.

More importantly, any delay that there has been so far in this case is entirely the fault of your client. You applied for, and got, an order from Mr Justice Steel on **3 February 2011** to serve the Claim Form on our clients in China. To date, <u>over 9 months later, you appear to not have taken any</u> steps to serve the Claim Form out of jurisdiction. This is despite your promised threat on 10 February 2011 that our clients "*will be served*". If you had proceeded to serve out as you threatened the Claim Form would have been served by now. It ill behoves your clients to claim that our clients are delaying, the delay lies entirely at your clients own doorstep as a result of their blatant attempt at forum shopping.

Our clients proffer that the real reason why your clients are now seeking to amend the Claim Form and to get alternative service is because of their own dilatory behaviour. The order of Mr. Justice Steel was valid for 12 months and those 12 months will soon expire. Your clients are simply trying to steal a march on our clients, in view of their own delays. That is not what the purposes of the alternative service provisions are.

The purported application to amend a Claim Form is no justification for suddenly seeking to bypass the order of Mr Justice Steel, or for ignoring the agreed wording of the Guarantee. In applying for the Order to serve out your clients clearly opted to follow the agreement in the Guarantee. Yet, they now appear to not want to follow it. What has changed in the circumstances? We do not believe that your clients' view of the underlying merits of the claim have changed. Accordingly, reference to the merits for seeking to infer a desire to delay on our clients' part, and a justification now for alternative service, is a red herring.

Nor do we believe that the fact that Wikborg Rein Singapore happen to be on the record for the party that gave the Guarantee, is any justification for alternative service on Wikborg Rein in London. As you are aware we are instructed in respect of the claim that you have attempted to bring under a charterparty. We have not been formally instructed in respect of the Guarantee claim except for the purposes of writing you this letter. Your presumption about our London office is therefore incorrect.

190

More fundamentally, it would make a mockery of the clear wording in the Guarantee if, by virtue of appointing solicitors to defend itself in one claim under a charterparty, our clients thereby automatically were deemed to have agreed to vary the wording of the Guarantee so that service could be effected on the London office of its appointed solicitors in the charterparty claim.

Lastly, as for the reference to the *Marconi* case this will not assist your clients in this case we believe, because it can be very clearly distinguished on the facts from the present situation. In *Marconi* the Defendant was clearly trying to avoid any type of liability or appearance in proceedings in London, and was challenging the applicable law and jurisdiction in an attempt to have the whole dispute moved to Indonesia. That is not the case here. Our clients do not challenge the jurisdiction of the High Court as that is clearly set out in the Guarantee, nor do our clients challenge the applicable law. Moreover in *Marconi*, the Claimant had not obtained an order for service out and done nothing to effect service for over 9 months!

We trust the above is clear. Should you nevertheless try to proceed to make an application for alternative service on our London office, we trust you will bring this letter to the Court's attention. Failing that we reserve the right to challenge any order made in your clients' favour on the basis, inter alia, of material non-disclosure.

Yours faithfully,

Wikborg Rein & Co.


**From:** Chris Grieveson
**Sent:** Monday, 14 November, 2011 5:57 PM
**To:** Trevor Fox; Russel Low; Steffen S. Pedersen
**Cc:** Paul Aston; Julian Davies
**Subject:** RE: "DONG-A ASTREA" [WRC-SG-LEGAL.FID16884] [HFWSH-HFWSH.FID20858]

Thank you for your message of Friday, which, as you will have noted, was received whilst I was absent from the office.

We are taking instructions on your request and we will revert shortly.

Kind regards

Chris Grieveson.

Chris Grieveson

Wikborg Rein & Co     Tel: (+65) 6438 4498     Mobile: (+65) 9112 8445
6 Raffles Quay     Direct: (+65) 6496 351     Fax: (+65) 6438 4496
#10-05/06     **24 hr Emergency Response:**     E-mail: CJG@wr.com.sg
Singapore 048580     **(+47) 22 82 77 00**     www.wr.no

*'Maritime Law Firm of the Year'* Lloyd's List Awards, Asia 2011
Ranked by ALB as one of Asia's 30 fastest growing law firms


# WIKBORG|REIN

*The firm is authorised and regulated by the Solicitors' Regulation Authority*

**Notice of confidentiality.**
The information contained in this e-mail is intended solely for the use of the addressee and it is sent in the strictest confidence, and may contain legally privileged information. If you have received this e-mail in error you must

191

# Exhibit D



**PRIVATE AND CONFIDENTIAL**

21 March 2014

Shagang Shipping Company Limited
Unit 2506-7 25/F Harbour Centre
25 Harbour Road
Wanchai

Dear Sir / Madam,

With reference to your enquiry of a transaction dated 13 March 2012, we confirm that the transaction details are as follows:

Date:                     13 March 2012
Transaction amount:       USD14,112,391.94.-
Credit A/C Name:          Shagang Shipping Company Limited
Debit A/C Name:           HNA Group (International) Company Limited

We give the foregoing information without any responsibility on the part of the Bank or any of its officers.

Yours faithfully,

Robin Pang
Vice President

**The Hongkong and Shanghai Banking Corporation Limited**
HSBC Main Building, 1 Queen's Road Central, Hong Kong
Tel: (852) 2822 1111   Fax: (852) 3418 4792
SWIFT: HSBCHKHH
Web: www.hsbc.com.hk

L019 (220998)

# Exhibit E

<u>2012 Folio 1208</u>

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**MR JUSTICE TEARE**

**B E T W E E N:**

Shagang Shipping Co., Ltd.

(a company incorporated under the laws of the

Hong Kong Special Administrative Region)

<u>Claimant</u>

- and -

HNA Group Co., Ltd.

(a company incorporated under the laws of the

People's Republic of China)

<u>Defendant</u>

"DONG-A ASTREA"

_____

ORDER

_____

**UPON** the application of the Claimant and upon reading the witness statement of
Trevor Whitney Fox dated 29 August 2012

**IT IS ORDERED THAT:**

1.    The Claimant, Shagang Shipping Co., Ltd., has leave to serve a Claim Form in
      the form attached to this Order on the Defendant, HNA Group Co., Ltd., out of
      the jurisdiction at its office at 29, Haixiu Rd., Haikou City, Hainan Province,

1

570206, in the People's Republic of China or elsewhere in the People's Republic of China as the Defendant may be found.

2.  The date of service of each of the Claim Form and Particulars of Claim will be deemed to be the second London business day after the Claim Form and Particulars of Claim are posted to Messrs. Wikborg Rein LLP at Cheapside House, 138 Cheapside, London EC2V 6HS, England if those documents are served by that method.

3.  The time for service of the Claim Form on the Defendant if served in accordance with paragraph 1 of this Order be extended to 12 months from the date of issue.

4.  The time for the Defendant to acknowledge service to be within 24 days after service of the Claim Form by either of the methods set out in paragraphs 1 or 2 above.

5.  The Defendant has liberty to apply to set aside this order by giving at least 14 days notice to the Claimant's solicitors, Holman Fenwick Willan LLP.

6.  Costs in the case.

Dated this 11 day of September 2012

Exhibit F

夏禮文律師行　　　　　　　　　　　holman fenwick willan 

---

<u>**BY COURIER AND BY FACSIMILE (+86 898 66798976)**</u>
**(68 PAGES)**

HNA Group Co., Limited
29 Haixiu Road,
Haikou City,
Hainan Province 570206
People's Republic of China

<u>For the attention of the Board of Directors</u>

15th Floor
Tower One, Lippo Centre
89 Queensway
Admiralty
Hong Kong

T: +852 3983 7788
F: +852 3983 7766
DX-9031-IC

**hfw.com**

**Our Ref:**   NFL/HLY/59322.3                          **Date:**   14 May 2013

Dear Sirs

**Statutory Demand under Section 327(4)(a) of the Companies Ordinance (Cap. 32)**

1.   We act for Shagang Shipping Company Limited ("Shagang").

2.   Pursuant to a long time charter between Shagang and Grand China Shipping (Hong Kong) Company Limited ("Grand China") dated 6 August 2008 (the "Charterparty"), Shagang chartered "DONG-A ASTREA" to Grand China for a period of between 82 and 86 months (attachment 1).

3.   By a performance guarantee dated 6 August 2008 (the "Guarantee", attachment 2) and pursuant to the terms of the Charterparty, HNA Group Co., Limited ("your company") absolutely and unconditionally guaranteed to Shagang the due and faithful performance and fulfilment of all terms and conditions in the Charterparty as primary obligor.

4.   On 17 January 2012, Shagang terminated the Charterparty by reason of Grand China's repudiatory breach and/or wrongful renunciation of the Charterparty.

5.   Pursuant to the Partial Final Award dated 1 November 2012, Shagang was awarded the principal sum of <u>US$58,375,709.52</u> (the "Debt") for damages for wrongful repudiation

**Lawyers for international commerce**

P. J. Hatzer  H. W. Dunlop  P. P. C. Yeung**  H. C. M. Fung**†  G. D. Lamplough  P. T. Murphy
S. J. Wise  C. T. Chan  N. J. E. Longley  P. C. P. Cheung  P. T. Coles  G. J. V. Hardaker  A. Williamson  V. Liu
G. Q. Gray*  G. M. T. Eddings*  N. D. Campbell*  P. T. Aston*  S. S. Davidson*  C. S. Quennell*  A. P. Apostolis*
Consultant : P. Rees-Smith*

Sao Paulo  London  Paris  Rouen  Brussels  Geneva  Piraeus  Dubai  Hong Kong  Shanghai  Singapore  Melbourne  Sydney  Perth

†Notary Public  / *Not Ordinarily Resident / **China–Appointed Attesting Officer

Page No. 2                                                       holman fenwick willan hf w

and/or renunciation of the Charterparty together with interest (attachment 3).  A correction
was made to the Partial Final Award dated 28 November 2012 (attachment 4).

6.    Pursuant to the terms and conditions of the Guarantee, the Debt is now due and owing by
your company to Shagang.

7.    On behalf of Shagang, we HEREBY DEMAND payment of the Debt now due by your
company to Shagang, of **US$58,375,709.52**    (Fifty-eight million, three hundred and
seventy-five thousand, seven hundred and nine United States Dollars and fifty-two Cents).
Payment of the said Debt should be remitted into Shagang's nominated bank account, the
details of which are as follows:

BANK:                    The Hongkong and Shanghai Banking Corporation Limited

SWIFT CODE:              HSBCHKHHHKH

BENEFICIARY:             Shagang Shipping Company Limited

A/C:                     ██████████████

AND TAKE NOTICE that if the said Debt is not paid by your company to Shagang within
forty-two (42) days of the date of service of this statutory demand upon your company or if
your company does not secure or compound for the said Debt to Shagang's reasonable
satisfaction, Shagang shall proceed under the provisions of the Companies Ordinance for the
winding-up of your company by the High Court of Hong Kong.

Yours faithfully

*Holman Fenwick Willan*

**Holman Fenwick Willan**
HFWHK1\2751857-2

# Exhibit G

夏禮文律師行                    holman fenwick willan hfw

---

**BY REGISTERED POST AND BY FACSIMILE (+86 898 66798976)**
**(1 PAGE)**

HNA Group Co., Limited

29 Haixiu Road,
Haikou City,
Hainan Province 570206
People's Republic of China

16/F Luk Kwok Centre
72 Gloucester Road
Wanchai
Hong Kong

15th Floor
Tower One, Lippo
Centre
89 Queensway
Admiralty
Hong Kong

T: +852 3983 7788
F: +852 3983 7766
DX-9031-IC

hfw.com

**Our Ref:** GDL/NFL/59322.66

**Date:** 19 July 2013

Dear Sirs

**Creditor: Shagang Shipping Company Limited**
**Debtor: HNA Group Co., Limited**

We refer to our clients' Statutory Demand dated 14 May 2013.

We understand from our clients that HNA Group Co., Limited ("HNA Group") has not taken any steps to settle the outstanding debt due to our clients.

In these circumstances, please note that we are instructed to commence winding up proceedings against HNA Group in Hong Kong.

Yours faithfully

*Holman Fenwick Willan*

**Holman Fenwick Willan**
HFWHK1\2839847-1

---

Lawyers for international commerce

P. J. Halzer  H. W. Dunlop  P. P. C. Yeung**  H. C. M. Fung***†  G. D. Lamplough  P. T. Murphy  S. J. Wise
C. T. Chan  N. J. E. Longley  P. C. P. Cheung  P. T. Coles  G. J. V. Hardaker  A. Williamson  V. Liu
G. M. T. Eddings*  N. D. Campbell*  P. T. Aston*  S. S. Davidson*  C. S. Quennell*  A. P. Apostolis*
Consultant : P. Rees-Smith*

Sao Paulo  London  Paris  Rouen  Brussels  Geneva  Piraeus  Dubai  Hong Kong  Shanghai  Singapore  Melbourne  Sydney  Perth

†Notary Public  / *Not Ordinarily Resident / **China-Appointed Attesting Office

8

# Exhibit H

013 Jul 26 10:28    HP LASERJET FAX                                    P.1



BY FACSIMILE (852 3983 7766)

26ʳᵈ, July 2013

Messrs Holman Fenwick Willan

15ᵗʰ Floor,

Tower One, Lippo Centre,

89 Queensway,

Admiralty, Hong Kong

Dear Sirs,

**Shagang Shipping dispute with GCS (HK) Ltd (in liquidation) and HNA Guarantee.**

We refer to your message last week threatening a winding up petition against HNA Group Co Ltd. We

note that you have also commenced proceedings in respect of the same alleged debt in the High

Court in London. HNA has substantive defenses to the Claim for payment under the guarantee which

will be put forward in the High Court. This is not, therefore, an undisputed debt. We will be filing a

defense at the appropriate time, meanwhile we are taking advice. Full details of the defense will be

provided in the English proceedings. For now any petition is premature and will be strongly resisted.

Yours faithfully,

Auditing and Legal Affairs Department,

HNA Group Co., Ltd.


海航集团有限公司        海南省海口市国兴大道7号海航大厦        邮编: 570203
HNA GROUP CO., LTD.    New HNA Plaza, No.7 Guoxing Road, Haikou city, Hainan Province, 570203, P.R.China
www.hnagroup.com       电话/Tel +86 898-6673 0005        传真/Fax +86 898-6678 1075

9

# Exhibit I

Made on behalf of the Defendant

Witness: Christopher James Grieveson

1st

Exhibits: CJG1

Dated 13 September 2013

**IN THE HIGH COURT OF JUSTICE**                      Claim No 2012 Folio 1208

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**BETWEEN:**

SHAGANG SHIPPING CO LTD                      Claimant

and

HNA GROUP CO LTD                      Defendant

---

WITNESS STATEMENT OF CHRISTOPHER JAMES GRIEVESON

---

I, CHRISTOPHER JAMES GRIEVESON of Wikborg Rein LLP, Cheapside House, 138 Cheapside, London EC2V 6HS do say as follows:

1.    I am a partner in the firm of Wikborg Rein LLP aforesaid and a solicitor qualified in England and Wales. I have day-to-day conduct of the above dispute on behalf of the Defendant ("HNA"). I am duly authorised by HNA to make this statement.

2.    I make this statement in support of HNA's application to extend time for the filing and service of its Defence by 28 days pursuant to CPR r. 3.1(2)(a). For the reasons set out in this statement, I believe that it would be in furtherance of the overriding objective to grant HNA such an extension and that the Court should grant HNA this extension in its discretion.

7

3.   The facts and matters set out in this statement are true to the best of my knowledge, information and belief, in accordance with my personal knowledge and involvement in the case, perusal of the papers, and instructions received from HNA.

4.   Exhibited to this statement marked "CJG1" is a paginated bundle of true copy documents to which I shall refer in this statement. References to this exhibit are in the format "CJG1/page number".

## The factual background

5.   As set out in the Particulars of Claim, this claim is made by the Claimant ("Shagang") against HNA under a performance guarantee dated 6 August 2008 ("the Guarantee"), pursuant to which HNA guaranteed the obligations of Grand China Shipping (Hong Kong) Company Limited ("GCS") under a time charterparty also dated 6 August 2008 ("the Charterparty") for the hire of a 179,239 DWT capesize bulk carrier later named MV "DONG-A ASTREA" ("the Vessel").

6.   More particularly, Shagang's claim relates to the termination of the Charterparty on 17 January 2012 by Shagang on account of GCS's alleged repudiatory failure to pay hire. As set out at paragraphs 16 and 17 of the Particulars of Claim, Shagang claimed damages on account of repudiatory breach from GCS in the sum of US$66,356,281. GCS did not pay that sum and Shagang accordingly claimed those sums on the Guarantee.

7.   Shagang also commenced arbitration proceedings against GCS under the Charterparty. By its Partial Final Award dated 1 November 2012, the arbitral tribunal upheld Shagang's claim to the extent of US$58,375,709.52. An application for permission to appeal against the Award under section 69 of the Arbitration Act 1996 was dismissed by Mr Justice Popplewell on 21 February 2013. GCS did not pay the sums awarded and on 8 April 2013 was compulsory wound up by Order of Mr Justice Harris sitting in the High Court of Hong Kong SAR on Shagang's petition.

8.   In the meantime, Shagang had sought and obtained permission to serve this claim out of the jurisdiction through the appropriate consular channels required by the Hague Service Convention. I understand that the claim form was served in or around late July 2013. HNA filed its Acknowledgement of Service on 15 August 2013.

**HNA's possible defence of bribery**

The investigation and detention of Mr Yang and Ms Chen

9.   I understand that in or around September 2011, HNA uncovered serious irregularities in certain expense and disbursement vouchers that had been submitted by a Mr Yang Tao and a Ms Chen Yuxia. Mr Yang was at that time the Chief Financial Officer of Grand China Logistics Holding (Group) Company Limited ("GCL"), a subsidiary of HNA and the immediate parent company of GCS. Between 26 February 2009 and 8 April 2011 he had been the Chief Financial Officer at GCS and prior to that had since 29 December 2007 been the General Manager's assistant in the Finance Department of GCL. Ms Chen was the Deputy General Manager in the Finance Department of GCS, a position that she had had since 5 March 2009. Prior to that she had worked as Deputy Manager in the Finance Department of GCL since 2006.

10.  Following a formal complaint by HNA to the Meilan Branch of the Public Security Bureau of Haikou City ("the PSB") on 4 June 2013, on 10 June 2013 the PSB made a formal decision to open a file to investigate Mr Yang and Ms Chen. I attach at **[CJG1/1 & 2]** notice of that decision and an English translation of the same.

11.  As the Court will observe, the file was opened "*to…investigate the bribery case of the non-state functionary Mr Yang Tao and Ms Chen Yuxia, the management team members of Grand China Shipping Co Ltd (for receiving bribes from Best Wealthy Limited, Shagang Shipping Company, etc.)*". It is not entirely clear to either myself or (so far as I am aware) HNA how the PSB has linked the irregular expense and disbursement vouchers (which I understand related to fraudulent travel and entertainment expenses) to "*receiving bribes from…Shagang Shipping Company*" but for the reasons set out below I verily believe that the PSB must have had some evidence to support that statement.

12.  In particular, the decision to open a file was made under Articles 107 and 110 of the Criminal Procedure Law of the People's Republic of China. I exhibit at **[CJG1/4]** the an English translation of the same which has been obtained from my colleagues in the Shanghai office of Wikborg Rein through Westlaw China.

13.  Article 107, in translation, states that: "*The public security organs or the People's Procuratorates shall, upon discovering facts of crimes or criminal suspects, file the cases for investigation within the scope of their jurisdiction*".

14.  Article 110, in translation, states that "*A People's Court, People's Procuratorate or public security organ*

*shall, within the scope of its jurisdiction, promptly examine the materials provided by a reporter, complainant or informant and the confession of an offender who has voluntarily surrendered. If it believes that there are facts of a crime and criminal responsibility should be investigated, it shall file a case. If it believes that there are no facts of a crime or that the facts are obviously incidental and do not require investigation of criminal responsibility, it shall not file a case and shall notify the complainant of the reason. If the complainant does not agree with the decision, he may ask for reconsideration."*

15.   At **[CJG1/5]** I exhibit Chinese law advice that HNA has obtained from Guandong Yiren Law Firm dated 14 August 2013.   Guandong Yiren confirms that (consistent with their natural reading) Articles 107 and 110 of the Criminal Procedure Law impose a merits threshold that the PSB must be satisfied of before opening a file.

16.   On 30 August 2013, formal detention warrants were issued for both Mr Yang and Ms Chen.   I exhibit the Chinese originals of those warrants and English translations at **[CJG1/22-25]**.

17.   Those warrants were issued under Article 80 of the Criminal Procedure Law.   I exhibit an English translation (obtained, again, by my Shanghai colleagues through Westlaw China) at **[CJG1/4]**, which states (in translation) that:

*"Public security organs may initially detain an active criminal or a major suspect under any of the following conditions:*

*(1)      if he is preparing to commit a crime, is in the process of committing a crime or is discovered immediately after committing a crime;*

*(2)      if he is identified as having committed a crime by a victim or an eyewitness;*

*(3)      if criminal evidence is found on his body or at his residence;*

*(4)      if he attempts to commit suicide or escape after committing a crime, or he is a fugitive;*

*(5)      if there is likelihood of his destroying or falsifying evidence or tallying confessions;*

*(6)      if he does not tell his true name and address and his identity is unknown; and*

*(7)      if he is strongly suspected of committing crimes from one place to another, repeatedly, or in a gang."*

18.   HNA has sought a supplementary legal advice from Guandong Yiren on this Article.   I exhibit that advice dated 2 September 2013 at **[CJG1/26]**.   Guandong Yiren has confirmed that the detention *"indicates that Meilan Sub-bureau has confirmed there exists evidence of the Suspects having*

*committed the offence referred to in the Decision to Open File, and it is necessary to pursue criminal liability".*

The investigation into Mr Sun

19.   I understand that the discovery of the irregularities set out above in relation to Mr Yang and Ms Chen instigated a wider investigation by HNA and the PSB into potentially improper conduct by senior GCS management vis-à-vis Shagang.   One particular individual subjected to investigation was Mr Sun Che, who was General Manager of GCS at the time that the Charterparty was concluded and was directly involved in the approval of the Charterparty.

20.   The PSB has kept HNA well informed of the course of its investigations into Mr Sun.  HNA has advised me that Mr Sun is suspected of the acceptance of bribes from Shagang in the negotiation, conclusion and performance of the Charterparty.

21.   As far as HNA is aware, the PSB investigation into Mr Sun and (in particular) into the allegations regarding the acceptance of bribes in connection with the Charterparty is at an early stage. However, the PSB has advised HNA of inconsistencies between the sums received into Mr Sun's bank accounts and the income he has legitimately derived from his employment at GCS, as follows.  Specifically, since April 2008, Mr Sun's lawful income from his employment with GCS has been about RMB 4.83 million.  Over that same period however Mr Sun and his wife Song Shijuan have opened more than twenty bank accounts and paid sums totalling RMB 22.96 million into those accounts.  I understand that over that same period Ms Song has opened a further five bank accounts into which deposits have been made of RMB 6.3 million (excluding transfers between those accounts or other accounts controlled by Mr Sun and Ms Song).

22.   Further, on 4 December 2008 (just under four months after the Charterparty was concluded), Mr Sun purchased a villa valued at about RMB 8 million at No 137, Lane 418, East Jinxiu Road.  I understand that the entire purchase price was paid in cash.

23.   These apparent discrepancies between Mr Sun's lawful income and the sums received into his family's bank accounts are being investigated further by the PSB.  I understand that the PSB interviewed Mr Sun on 12 September 2013.  As at the date of this statement, HNA is not aware of the outcome of that interview.  However HNA anticipates that the PSB will shortly update it and also make a formal decision whether or not to open a file.

L_4025183_V1 13.09.13 520315-004

<u>Further irregularities in the conclusion of the Charterparty</u>

24.  In addition to the investigation by the PSB into Mr Sun, HNA has carried out its own internal investigation into the circumstances in which the Charterparty was concluded.  That investigation has thrown up a number of irregularities:

(1)  It appears that Mr Sun did not follow the appropriate internal protocols for the approval of the Charterparty.  The Charterparty was fixed at a rate of US$52,500 per day over a period of minimum 82 / maximum 86 months.  The sums payable under the Charterparty over its lifetime were therefore in the order of US$130 million, with such sums to be secured by the Guarantee.  Given the sums involved, I am instructed that on 7 August 2008, Wang Jian, Vice Chairman of HNA, instructed Mr Sun to defer execution of the Charterparty until after legal review and approval by Wei Jun, HNA's Chief Financial Officer.  That instruction was given through HNA's dedicated contract approval form which I exhibit at **[CJG1/43]**.  I do not at this time have an English translation of the same but the gist of the words used has been communicated to me by HNA.  Mr Sun appears to have ignored that instruction and proceeded to execute the Charterparty on a clean fixture basis on 8 August 2008 (see the broker's recap of that date at **[CJG1/48]**).

(2)  HNA's internal investigation team have inspected the original Charterparty as executed.  Those originals bear the stamp of GCS but neither the originals nor any copies bear the signature or seals of Shagang.  I am informed that this would be contrary to standard business practice in China, where both parties' personnel are based.

(3)  I understand that the negotiations over the Charterparty were very cursory.  I exhibit at **[CJG1/51]** a full copy of the broker's fixing file.  The Court will note that whilst that fixing file evidences negotiation over certain terms such as bunkers on redelivery and speed and performance adjustments, there is no evidence whatsoever in that file as to any negotiations on the charter rate.  Further, from the opening of the fixing file to the conclusion of the Charterparty was only four days.

25.  I acknowledge that some of these matters, taken individually, might not be cause for suspicion.  However, taken cumulatively and in conjunction with the matters uncovered by the PSB in their

investigation into Mr Sun and his finances, I believe that HNA has legitimate grounds for wishing to investigate further any possible illicit dealings between Mr Sun and Shagang.

## The legal effect of the bribery

26. Should the investigations by PSB and/or HNA uncover evidence of bribery, I believe that that would not only entitle GCS (now through its liquidator) to rescind the Charterparty (which would, of course, have the effect of discharging any liability that HNA would otherwise be under) but would also separately entitle HNA to rescind the Guarantee.

27. That submission can be developed so far as necessary by Counsel, but the grounds of rescission would be the bribery itself, or on the basis of fraudulent misrepresentation or non-disclosure. At the very least, if HNA is able to establish a *prima facie* case of bribery, it would be entitled to advance a triable defence along those lines.

## The need to investigate the bribery further

28. As foreshadowed above, however, the investigation into Mr Sun's potential involvement in the acceptance of bribes is still at an early stage, although it is anticipated that the results of the PSB's interview will be made available to HNA soon.

29. I understand that it is expected that the PSB will, possibly in the near future, also wish to interview Mr Jian Rui (Deputy Manager at the Chartering Department at GCS at the material time), Mr Xu Wenzhong (the then Deputy General Manager at Shagang), Zhang Yingbin (the Chartering Manager at GCS at the material time), Shen Wenfu (the General Manager at Shagang at the material time who was, I am informed, dismissed for misappropriation of company assets), and the broker Hong Xiangbin of Howe Robinson.

30. Whether or not there has been bribery will, HNA understands, be clearer once those interviews have been concluded. Accordingly, HNA respectfully invites the Court to grant it an extension of time of 28 days so that it can take an informed view based on the further evidence arising out of the PSB investigation as to whether or not it would be appropriate to make allegations of bribery in this action and, if so advised, plead a Defence along those lines.

31.   Further, I verily believe that the grant of this extension of time would be in accordance with the overriding objective. There will be little prejudice to Shagang as a result of the short delay to the action, and any such prejudice could be compensated by an award of interest. By contrast, if no extension were granted, HNA might be shut out from defending a very substantial claim on the grounds of Shagang's own dishonest conduct in bribing GCS employees. Further, HNA has deliberately asked for a relatively modest period to minimise any delay to these proceedings (although of course without prejudice to any further request that it may wish to make having regard to the progress of the PSB investigation). All in all, I believe that the balance of prejudice strongly favours an extension of time along the lines sought.

### Other matters

32.   In the interests of transparency, I should advise the Court that HNA has also sought and obtained a 14-day extension of time from Shagang by consent. That consent was obtained on the basis that relevant fee earners in our offices and our Counsel had been away over the summer break. It was not related to the investigation into the bribery I have set out above. I exhibit at **[CJG1/89]** the relevant correspondence. By their email dated 2 September 2013, Holman Fenwick & Willan LLP (Shagang's solicitors) agreed to a 14-day extension but made clear that *"No further voluntary extensions will be agreed"* **[CJG1/90]**; hence this application.

33.   In that correspondence, Holman Fenwick & Willan LLP has variously alleged that HNA has *"been well aware of these claims for over 3 years"* and has *"been aware of these claims for several years"*. That is not so. It is true that Shagang has in the past sought to claim unpaid hire under the Guarantee. However, as was accepted by Shagang at paragraph 6 of the witness statement of Trevor Whitney Fox dated 29 August 2012 (served in support of its application for permission to serve the claim form out of the jurisdiction and/or by alternative means) **[CJG1/95]** all hire that had accrued under the Charterparty had been paid by May 2012. The only claim outstanding relates to HNA's alleged liability under the Guarantee in respect of GCS's liability in damages for the repudiation of the Charterparty. As set out above, GCS's liability was only ascertained by the award dated 1 November 2012 (and the refusal of permission to appeal against the said award on 21 February 2013) and since then Shagang has been taking the necessary steps to serve the claim form on HNA out of the jurisdiction. It cannot be said that this is a claim that HNA has known about for years.

14

Made on behalf of the Defendant

Witness: Christopher James Grieveson

2nd

Exhibits: CJG2

Dated 11 October 2013

<u>Claim No 2012 Folio 1208</u>

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>QUEEN'S BENCH DIVISION</u>

<u>COMMERCIAL COURT</u>



BETWEEN:

SHAGANG SHIPPING CO LTD     <u>Claimant</u>

and

HNA GROUP CO LTD     <u>Defendant</u>

---

<u>SECOND WITNESS STATEMENT OF CHRISTOPHER JAMES GRIEVESON</u>

---

I, **CHRISTOPHER JAMES GRIEVESON** of Wikborg Rein LLP, Cheapside House, 138 Cheapside, London EC2V 6HS do say as follows:

1.  I am the same Christopher James Grieveson who has previously given a witness statement in these proceedings, dated 13 September 2013. I adopt the same abbreviations and definitions in this statement as is my first statement. As set out therein, I am a partner in the firm of Wikborg Rein LLP aforesaid and a solicitor qualified in England and Wales with day-to-day conduct of the above dispute on behalf of HNA. I am duly authorised by HNA to make this statement.

2.  I make this statement in support of HNA's application to extend time for the filing and service of its Defence by a further 28 days pursuant to CPR r. 3.1(2)(a). For the reasons set out in this statement, I believe that it would be in furtherance of the overriding objective to grant HNA such an extension and that the Court should grant HNA this extension in its discretion.

132

3.   The facts and matters set out in this statement are true to the best of my knowledge, information and belief, in accordance with my personal knowledge and involvement in the case, perusal of the papers, and instructions received from HNA.

4.   Exhibited to this statement marked "CJG2" is a paginated bundle of true copy documents to which I shall refer in this statement.  References to this exhibit are in the format "CJG2/page number".

## The factual background

5.   The factual background to this application is set out at paragraphs 5 to 25 of my first witness statement, to which I would respectfully refer the Court.  In summary:

(1)   This claim is made against HNA under the Guarantee dated 6 August 2008 pursuant to which it guaranteed the obligations of Grand China Shipping (Hong Kong) Company Limited ("GCS") to Shagang under the Charterparty between GCS and Shagang dated 6 August 2008.

(2)   By a Partial Final Award dated 1 November 2012, GCS was found to have repudiated the Charterparty and ordered to pay damages to Shagang in the sum of US$58,375,709.52. GCS failed to do so and was wound up on 8 April 2013.  Shagang now presents this claim under the Guarantee in respect of the sums adjudged due to it from GCS.

(3)   On 10 June 2013, the Haikou City Public Security Bureau ("PSB") made a formal decision to open a file to investigate Yang Tao (then CFO of Grand China Logistics Holding (Group) Company Limited ("GCL") (GCS's immediate parent company and a subsidiary of HNA) and, prior to that, CFO of GCS) and Chen Yuxia (Deputy General Manager in the Finance Department of GCS) *"for receiving bribes from Best Wealthy Limited, Shagang Shipping Company, etc"*[1]. On 30 August 2013 formal detention warrants were issued for both Mr Yang and Ms Chen[2]. Mr. Yang was detained by the PSB on 19 September 2013 and Ms Chen was detained by the PSB on 20 September 2013.  HNA has obtained Chinese law

---

[1]   [CJG1/pp1-2]
[2]   [CJG1/pp22-25]

advice from Guandong Yiren to the effect that this indicates that the Haikou City PSB must believe that there exists sufficient evidence of the commission of the offence to pursue criminal liability.

(4)  The Haikou City PSB is also investigating Sun Che, who was General Manager of GCS at the time that the Charterparty was concluded and was directly involved in the approval of the Charterparty.  I understand from HNA that Mr Sun is also suspected by the PSB of taking bribes from Shagang in connection with the negotiation, conclusion and performance of the Charterparty.  The PSB has uncovered serious discrepancies between the sums going into the 25 bank accounts owned by Mr Sun and his wife, and Mr Sun's legitimate income.

(5)  There were a number of irregularities in the execution of the Charterparty, chief amongst them the fact that the Charterparty was executed by Mr Sun without legal review and approval from HNA's CFO, in direct contravention of a specific instruction from HNA's Vice Chairman Wang Jian for that review and approval to be carried out.

(6)  As indicated in my first witness statement, the PSB investigation into Mr Yang, Ms Chen and Mr Sun is an on-going one.  Mr Yang and Ms Chen are still in the custody of PSB now.

Update on developments in the PSB investigation

6.  On 3 October 2013, the PSB issued a "Decision on Case Filing" under Articles 107 and 110 of the Criminal Procedural Law of the People's Republic of China against Jia Hongxiang *"in terms of his suspected conviction of misappropriation of funds"*.  On that same day, a warrant was issued for the detention of Mr Jia under Article 80 of the said Criminal Procedural Law.  I exhibit the original Chinese documents and English translations thereof at [CJG2/1-4].

7.  I enclose at [CJG2/5-18] a further legal advice from Guangdong Yiren advising on the significance of the "Decision on Case Filing" and detention warrant issued against Mr Jia in light of Articles 80, 107 and 110 of the said Criminal Procedural Law, translations of which may be found at [CJG1/4].

8.  Guangdong Yiren's conclusions are that the PSB *"considers that [Mr Jia] has been involved in the crime*

134

*of misappropriation of funds and has obtained certain evidences proving the crime and thus considers that [Mr Jia] has committed criminal acts and shall be criminally responsible".*

9.  Mr Jia was at all material times, including when the Charterparty was executed, the CEO of GCS. He was the immediate superior to Mr Sun and approved Mr Sun's decision to execute the Charterparty notwithstanding and directly in contravention of the instruction from Mr Wang Jian that the Charterparty and Guarantee Letter had to undergo legal review and approval from the HNA CFO before the Guarantee could be issued.

10. It is in my view striking that both of the relevant individuals informed in the execution of the Charterparty, both of whom contravened the  approval procedures, are under investigation for dishonesty offences in connection with abuse of their positions at GCS and, at least in the case of Mr Sun, HNA understands that the PSB are specifically investigating him in respect of bribes received from Shagang.

## The application for a further extension of time

11. Although the PSB investigation is still at a relatively early stage, it does appear to me that the investigation is uncovering evidence of endemic corruption at senior management level of GCS. Not only that, but the PSB appear to have evidence that at least two of the senior management team were suspected of taking bribes from Shagang with a third, Mr Sun, being investigated in respect of the same in light of the enormous discrepancies between his personal financial situation and his legitimately earned income.

12. As I explained at paragraphs 26 and 27 of my first statement, should the investigations uncover evidence of bribery by Shagang, *"that would not only entitle GCS (now through its liquidator) to rescind the Charterparty (which would, of course, have the effect of discharging any liability that HNA would otherwise be under) but would also separately entitle HNA to rescind the Guarantee".* That would accordingly amount to a full defence to this entire claim, which is quantified at US$58,375,709.52 exclusive of interest and costs.

13. In circumstances where the PSB investigation is on-going but is evidently turning up new evidence about the corruption within GCS's former senior management, I believe that it would be in accordance with the overriding objective for HNA to be granted a further 28 days'

135

extension so that it can consider what further evidence arises out of the PSB investigation and, if so advised, plead a Defence making allegations of bribery against Shagang. There would be little prejudice to Shagang caused by this short extension of time and any prejudice would in any event be compensable in interest. By contrast, if no extension were granted, HNA might be shut out from defending a very substantial claim on the grounds of Shagang's own dishonest conduct in bribing GCS employees. In those circumstances, I verily believe that it would be in the interests of justice for HNA to be granted the extension sought

## Conclusion

14. For the reasons set out in this statement, I believe that the Court should grant HNA the 28 days' further extension of time to file and serve its Defence sought.

15. Separately and for the sake of good order, I enclose at [CJG2/19-23] a translation of the approval form referred to in my first witness statement and enclosed at [CJG1/43].

16. I believe that the facts set out in this statement are true.


Signed: _____


Christopher James Grieveson


Dated: _____11 October 2013_____

136